# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BONNIE RANDALL WEBB,      )
                                  )
                 Plaintiff,    )
                                  )
                 v.            )      1:20CV714
                                  )
KILOLO KIJAKAZI,         )
Acting Commissioner of Social  )
Security,                  )
                                  )
                 Defendant.[1]   )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Bonnie Randall Webb, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 13; see also Docket Entry 12 (Plaintiff's Memorandum), Docket Entry 14 (Defendant's Memorandum); Docket Entry 15 (Plaintiff's Reply); Docket Entry 16 (Plaintiff's Suggestion of Subsequently Decided Authority)). For

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 310-23), alleging an onset date of January 28, 2016 (see Tr. 310, 317). Upon denial of those applications initially (Tr. 169-204, 248-67) and on reconsideration (Tr. 205-44, 270-88), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 289-90). Plaintiff, her non-attorney representative, and a vocational expert ("VE") attended the hearing. (Tr. 36-68.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 14-29.)[2] The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 307-09, 400-02), making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2017.

2. [Plaintiff] has not engaged in substantial gainful activity since January 28, 2016, the alleged onset date.

---

[2] The same ALJ denied Plaintiff's previous applications for DIB and SSI on February 1, 2016 (Tr. 148-64), the Appeals Council subsequently denied Plaintiff's request for review (see Tr. 171), and this Court thereafter affirmed the Commissioner's final decision denying benefits, see Webb v. Berryhill, No. 1:17CV341, 2018 WL 2198829 (M.D.N.C. May 14, 2018) (unpublished), recommendation adopted, 2018 WL 2583113 (M.D.N.C. June 4, 2018) (unpublished) (Biggs, J.).

2

3. [Plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine; bilateral hip degenerative joint disease; hyperlipidemia; high cholesterol; gastroesophageal reflux disease (GERD); obesity; [and] depression.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform light work . . . except she cannot climb ladders, ropes, and/or scaffolds. She can occasionally climb stairs and ramps. She must avoid extreme temperatures. She must avoid concentrated exposure to dust, fumes, etc. She must have a sit/stand option and be able to change position once per hour for five minutes at one time. She is limited to simple[,] routine, repetitive tasks of unskilled work. She can occasionally interact with the public, supervisors, and/or coworkers. [Plaintiff] can stay on task two hours at a time. She can never perform work involving complex-decision making, crisis situations, or constant changes in routine.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

3

11.  [Plaintiff] has not been under a disability, as
defined in the . . . Act, from January 28, 2016, through
the date of this decision.

(Tr. 20-29 (bold font and internal parenthetical citations
omitted).)[3]

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope
of [the Court's] review of [such a] decision . . . is extremely
limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Plaintiff has not established entitlement to relief under the
extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead,
the Court "must uphold the factual findings of the ALJ if they are
supported by substantial evidence and were reached through
application of the correct legal standard." Hines, 453 F.3d at 561
(internal brackets and quotation marks omitted).  "Substantial
evidence means 'such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion.'" Hunter v. Sullivan,

_____

[3] The ALJ appears to have mistakenly described by finding that Plaintiff's
hyperlipidemia, high cholesterol, and GERD as both severe impairments and non-
severe impairments.  (See Tr. 20.)  Plaintiff, however, has not raised that
matter in any of her issues on review, and her arguments do not implicate those
impairments.  (See Docket Entries 12, 15.)

4

993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[4] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u> (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' <em>i.e.</em>, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d 473, 475

---

[4] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

6

n.2 (4th Cir. 1999).[5]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[6]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80.  However, if the claimant establishes an inability to

---

[5]  "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[6]  "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[7]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ failed to evaluate or explain how the combination of [Plaintiff's] obesity, degenerative lumbar disc disease, and bilateral degenerative hip joint disease limited her ability to function" (Docket Entry 12 at 8 (bold font and single-spacing omitted); see also Docket Entry 15 at 1-7);

2) the ALJ erred in discounting the opinions of consultative medical examiner Dr. Everett A. Bolz, in that "the ALJ only pointed to the alleged vagueness of [Dr. Bolz's] conclusions" and "fail[ed]

---

[7] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

to comply with the Commissioner's regulations" regarding the evaluation of opinion evidence (Docket Entry 12 at 16 (bold font and single-spacing omitted); <u>see also</u> Docket Entry 15 at 7-8); and

3) "[Plaintiff] is entitled to a new hearing on her 2013 applications because the ALJ was not a Constitutionally-appointed officer at the time he denied [Plaintiff]'s prior applications" (Docket Entry 12 at 19 (bold font and single-spacing omitted); <u>see also</u> Docket Entry 15 at 8-10).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 14 at 11-20.)

## 1. RFC

In Plaintiff's first issue on review, she contends that "[t]he ALJ failed to evaluate or explain how the combination of [Plaintiff's] obesity, degenerative lumbar disc disease, and bilateral degenerative hip joint disease limited her ability to function." (Docket Entry 12 at 8 (bold font and single-spacing omitted); <u>see also</u> Docket Entry 15 at 1-7.) In addition, Plaintiff asserts that the ALJ failed to properly account for the combined effect of Plaintiff's obesity and other impairments in the RFC in three respects: the ALJ 1) "failed to explain the connection between [Plaintiff]'s obesity and the [RFC's] imposed environmental restrictions [of avoiding extreme temperatures and concentrated exposure to dusts, fumes, etc.]" (Docket Entry 12 at 8-9 (citing Tr. 20, 23, 25); <u>see also</u> Docket Entry 15 at 1), 2) "provide[d] no

9

explanation for how he arrived at [the five-minute] interval [every hour in the sit/stand option], which he appear[ed] to have plucked out of thin air" (Docket Entry 12 at 13; see also Docket Entry 15 at 2), and 3) "acknowledged that [Plaintiff]'s weight may affect her ability to stand and walk for extended periods" (Docket Entry 12 at 10 (citing Tr. 21)), but did not "assess[] th[at] obesity-related limitation when finding that [Plaintiff] could perform light work, which requires 'a good deal of walking or standing'" (id. (citing Social Security Ruling 83-10, Titles II and XVI: Determining the Capability to Do Other Work - The Medical-Vocational Rules of Appendix 2, 1983 WL 31251 (1983) ("SSR 83-10")); see also Docket Entry 15 at 5). According to Plaintiff, the ALJ's errors in that regard prejudiced her because, "[i]f [she] were limited to sedentary work as the result of her obesity, lumbar degenerative disc disease and bilateral hip degenerative joint disease, she would be disabled by application of Medical-Vocational Rule 202.14 as a 50-year-old high-school graduate limited to unskilled work when her disability began in 2016." (Docket Entry 12 at 15-16 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.14).) Plaintiff's contentions miss the mark.

a. Analysis of Combined Effect of Obesity and Other Impairments

Plaintiff maintains that "the ALJ did not discuss the combined impact of [Plaintiff]'s degenerative disc disease, degenerative joint disease, and obesity on her RFC, and did not mention these impairments, or any other impairments, when discussing the impact

10

of her obesity on her other impairments." (Docket Entry 12 at 12 (citing Tr. 25); see also Docket Entry 15 at 5.) Although Plaintiff acknowledges "[t]hat the ALJ [] stated that he 'considered the effects of obesity in combination with [Plaintiff]'s other impairments'" (Docket Entry 12 at 11 (quoting Tr. 25)), Plaintiff argues that such a statement "is not a discussion or an explanation," but "just an unsupported statement" (id.; see also Docket Entry 15 at 2). According to Plaintiff, "[t]he Commissioner recognizes that the combined effects of obesity with another impairment may be greater than each of the impairments separately and that someone with obesity and arthritis affecting a weight-bearing joint may have more pain and functional limitations than she would with arthritis alone." (Docket Entry 12 at 11 (citing Social Security Ruling 19-2p, Titles II and XVI: Evaluating Cases Involving Obesity, 2019 WL 2374244, at *4 (May 20, 2019) ("SSR 19-2p"), and noting that "ALJ applied [Social Security Ruling 02-1p, Titles II and XVI: Evaluation of Obesity, 2002 WL 34686281 (Sept. 12, 2002) ('SSR 02-1p')] ([Tr.] 25), but [that] both [R]ulings recognize the exacerbating effect that obesity has on weight-bearing joints").) Plaintiff argues that the ALJ's failure to evaluate the combined effects of Plaintiff's obesity and other impairments precludes the Court from "determin[ing] whether . . . [the ALJ's] findings are supported by substantial evidence." (Id. at 12.)

A well-reasoned decision from a neighboring court addresses an ALJ's obligation to consider the combined effect of a claimant's impairments:

> When dealing with a claimant with multiple impairments, the Commissioner must consider the combined effect of a claimant's impairments and not fragmentize them." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citing Reichenbach v. Heckler, 808 F.2d 309 (4th Cir. 1985)[)]. This requires the ALJ to "adequately explain his or her evaluation of the combined effects of the impairments." Id. The ALJ's duty to consider the combined effects of a claimant's multiple impairments is not limited to one particular aspect of review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.
>
> Following the Walker decision, the Fourth Circuit has provided little elaboration on what constitutes an "adequate" combined effect analysis. . . . In an unpublished opinion decided after Walker, the Fourth Circuit . . . found that the district court "correctly determined that the ALJ had adequately explained his evaluation of the combined effect of [the claimant's] impairments." [Green v. Chater, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995) (unpublished)]. In reaching this conclusion, the court focused on the ALJ's conclusory statement that he had considered all of the claimant's impairments, both singularly and in combination and then noted evidence that was consistent with this conclusion. Id. This evidence consisted of (1) the ALJ's finding that the claimant's combination of impairments precluded heavy lifting; (2) the ALJ's listing and consideration of each of the alleged impairments; and (3) the ALJ's finding that many of the claimant's symptoms were treatable. Id. Thus, this limited threshold for an "adequate" combined effect analysis suggests that "Walker was not meant to be used as a trap for the Commissioner." Brown v. Astrue, 0:10CV1584, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012). "Accordingly, the adequacy requirement of Walker is met if it is clear from the decision as a whole that the ALJ considered the combined effect of a claimant's impairments." Id.

12

Williams v. Colvin, No. 6:11CV2344, 2013 WL 877128, at *2 (D.S.C. Mar. 8, 2013) (unpublished) (footnote omitted).

Here, at step three, the ALJ expressly found that Plaintiff did "not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments." (Tr. 20 (bold font omitted) (underscoring added).) Concerning Plaintiff's obesity in particular, the ALJ provided the following analysis, which clearly demonstrates that the ALJ considered Plaintiff's obesity in combination with her other impairments:

> [Plaintiff]'s physical condition is compounded by her diagnosis of obesity. Because [Plaintiff] is 5'3" tall, at times weighed 185 pounds, and had a body mass index (BMI) over 30, she is considered "obese." While there no longer is a listing for obesity, [Plaintiff]'s weight has been carefully considered within the parameters of [SSR] 02-01p (see also Listings 1.00Q, 3.00I and 4.00I). While [Plaintiff]'s weight may affect her ability to stand and walk for extended periods, in light of the objective findings, it does not reasonably appear that the extent of her obesity, even when considered in combination with her other documented impairments, meets or equals a listed impairment. On one occasion, [Plaintiff]'s treatment provider recommended she use a single-point cane. However, [Plaintiff] did not appear at her medical appointments with a cane. Moreover, [Plaintiff] reported she does not need a companion to accompany her when she leaves her home. In this case, [Plaintiff]'s weight does not appear to reduce her functioning to the severity level contemplated by any listing[.]

(Tr. 21 (emphasis added) (internal parenthetical citations omitted).)

Moreover, in conjunction with the RFC determination, the ALJ stated that he had "considered all symptoms and the extent to which

13

these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" (Tr. 23 (emphasis added)), discussed the evidence with regard to Plaintiff's lumbar degenerative disc disease, hip degenerative joint disease, and obesity (see Tr. 23-25), and again noted that he had "considered the effects of obesity in combination with [Plaintiff's] other impairments" (Tr. 25 (emphasis added)). That analysis suffices. See Flaherty v. Astrue, 515 F.3d 1067, 1071 (10th Cir. 2007) ("The ALJ stated that he considered all of [the plaintiff's] symptoms in assessing her RFC. Our general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter. Furthermore, the ALJ's discussion of the evidence and his reasons for his conclusions demonstrate that he considered all of [the plaintiff]'s impairments." (internal citations, quotation marks, and brackets omitted)); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) ("After separately discussing [the plaintiff's] physical impairments, affective disorder, and complaints of pain, as well as her daily level of activities, the ALJ found that her impairments d[id] not prevent [her] from performing her past relevant work. To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." (internal quotation marks omitted)); Gooch v. Secretary, Health & Human Servs., 833 F.2d 589, 592 (6th Cir. 1987) ("[T]he fact that each element of the record was discussed individually hardly suggests that the totality of the

14

record was not considered, particularly in view of the fact that the ALJ specifically referred to 'a combination of impairments' in deciding that [the plaintiff] did not meet the 'listings.'"); Wilson-Coleman v. Colvin, No. 1:11CV726, 2013 WL 6018780, at *3 (M.D.N.C. Nov. 12, 2013) (unpublished) (Webster, M.J.) (concluding that "sufficient consideration of the combined effects of a claimant's impairments is shown when each is separately discussed in the ALJ's decision, including discussion of a claimant's complaints of pain and level of daily activities" (internal brackets omitted)), recommendation adopted, slip op. (M.D.N.C. Dec. 6, 2013) (Schroeder, J.); Jones v. Astrue, No. 5:07CV452, 2009 WL 455414, at *15 (E.D.N.C. Feb. 23, 2009) (unpublished) (noting that ALJ's RFC assessment and summarization of medical records as to each impairment indicated ALJ "considered all of [the c]laimant's mental and physical limitations together").

b. Accounting for Effects of Obesity in RFC

Plaintiff next faults the ALJ for "fail[ing] to explain the connection between [Plaintiff]'s obesity and the [RFC's] imposed environmental restrictions." (Docket Entry 12 at 8-9 (citing Tr. 20, 23, 25); see also Docket Entry 15 at 1.)  In that regard, Plaintiff challenges the ALJ's observation "that [Plaintiff]'s 'treatment providers' did not attribute any functional limitations to her weight" (Docket Entry 12 at 9 (quoting Tr. 25) (footnote omitted)), pointing out that "none of her 'treatment providers' imposed any functional limitations concerning any physical

15

impairment" (id. (citing Parker v. Astrue, No. 8:09CV1177, 2010 WL 1836818, at *3 (M.D. Fla. May 3, 2010) (unpublished) ("[T]he absence of a statement regarding functional limitations from obesity does not warrant an inference that there were none.")); see also Docket Entry 15 at 3-4). Plaintiff further contends that the ALJ's remark "[t]hat [Plaintiff] did not use a single-point cane at medical appointments, despite a treatment provider's recommendation, and did not need a companion to accompany her when she le[ft] home[,] d[id] not explain why the ALJ imposed only environmental limitations as the result of [Plaintiff's] obesity." (Docket Entry 12 at 10 (citing Tr. 21).)

Consideration of the ALJ's discussion immediately preceding his evaluation of Plaintiff's obesity dispels her argument that the ALJ "failed to explain the connection between [Plaintiff]'s obesity and the imposed environmental restrictions" in the RFC (Docket Entry 12 at 8-9 (citing Tr. 20, 23, 25)). (See Tr. 24-25.) The ALJ explained his physical RFC determination as follows:

> Upon examination, [Plaintiff] at times displayed an antalgic gait. Yet, on other occasions treatment providers noted her gait was normal. Similarly, straight-leg raising tests were at times positive. However, she consistently had 5/5 strength in the lower extremities. During the relevant period, [Plaintiff] did not seek emergency treatment and was not hospitalized due to her back condition. Lastly, the record does not reflect she is a candidate for lumbar spine surgery. Accordingly, the [ALJ] accommodated [Plaintiff]'s lumbar spine impairment by limiting her to light work, never climbing ladders, ropes, or scaffolds, and having the option to alternate between sitting and standing.

16

In terms of [Plaintiff]'s hip, she complained of
difficulty laying on her side, and pain increased with
various activities. An x-ray of her hips showed moderate
joint-space narrowing and acetabular spurring of the
right hip. A prior imaging study showed moderately
advanced degenerative joint disease of the left hip.
Like her lower back, [Plaintiff] underwent trochanteric
bursa injections. Nevertheless, examinations of
[Plaintiff]'s hips at times noted decreased range of
motion. [Plaintiff] reported that her hip symptoms
improved following the injection. The [ALJ] accommodated
[Plaintiff]'s hip impairment by limiting her to light
work with the option to alternate between sitting and
standing.

The [ALJ] also considered how [Plaintiff]'s weight
affects her ability to perform routine movements and
necessary physical activity within the work environment
(SSR 02-lp). Furthermore, the [ALJ] considered the
effects of obesity in combination with [Plaintiff's]
other impairments. [Plaintiff]'s BMI was often around
32. Her treatment providers did not attribute any
functional limitations to her weight. Although her
medical providers recommended a healthier diet and
exercise, they never recommended that [Plaintiff] explore
more intensive weight loss measures such as surgery. In
consideration of this impairment, the [ALJ] limited
[Plaintiff] to avoiding extreme temperatures and
concentrated exposure to dusts, fumes, etc.

(Tr. 24-25 (emphasis added) (certain internal parenthetical
citations omitted).) In other words, the ALJ had already limited
Plaintiff to light work with a sit/stand option and precluded the
climbing of ladders, ropes, and scaffolds to account for her back
and hip impairments. (See id.) The ALJ thereafter explained that,
because Plaintiff's Body Mass Index ("BMI") remained about 32,[8] and
because her "treatment providers did not attribute any functional

---

[8] That score falls within the obesity Class I, the lowest of three Classes. See
SSR 02-1p, 2002 WL 3468681, at *2; see also https://www.cdc.gov/
obesity/adult/defining.html (last visited Nov. 3, 2021).

17

limitations to her weight" or "recommend[] . . . intensive weight loss measures such as surgery," the ALJ added only environmental restrictions to the RFC to accommodate Plaintiff's obesity (Tr. 25).[9]  Moreover, contrary to Plaintiff's assertions (see Docket Entry 12 at 10), the ALJ's observations that "[Plaintiff] did not appear at her medical appointments with a cane" and "reported she does not need a companion to accompany her when she leaves her home" (Tr. 21) bear relevance to the impact of Plaintiff's obesity on her ability to stand, walk, and balance.

Plaintiff's reliance on Parker to rebuff the ALJ's observation that no treatment providers offered restrictions arising out of Plaintiff's obesity falls short. (See Docket Entry 12 at 9 (citing Tr. 25); see also Docket Entry 15 at 3-4.)  In Parker, the plaintiff "st[ood] 5'9" and weigh[ed] about 292-295 pounds," placing him in the classification "morbidly obese," but the ALJ "did not even mention the plaintiff's weight and height, and, more significantly, did not evaluate an impairment of obesity." Parker,

---

[9] Dr. Bolz assessed Plaintiff with, inter alia, "[u]ncontrolled hypertension" and "[m]ild asthma." (Tr. 433.)  In turn, the initial-level state agency medical consultant precluded concentrated exposure to extreme temperatures and pulmonary irritants (see Tr. 181, 199), and the reconsideration-level consultant precluded concentrated exposure to pulmonary irritants (see Tr. 219, 239) to account for Plaintiff's hypertension (see Tr. 181, 199, 219, 239).  The ALJ subsequently credited the consultants' environmental restrictions (see Tr. 25-26), although, as discussed above, the ALJ attributed his environmental restrictions to Plaintiff's obesity (see Tr. 25).  That attribution, however, makes sense because, although the ALJ did not find hypertension and asthma to constitute medically determinable impairments (see Tr. 20), SSR 02-1p expressly recognizes that "obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems," SSR 02-p, 2002 WL 34686281, at *5 (emphasis added), and further observes that "[t]he ability to tolerate extreme heat, humidity, or hazards may also be affected," id. at *6 (emphasis added).

2010 WL 1836818, at *2. As a result, the court rejected the Commissioner's "harmless error argument" that no providers had set forth any obesity restrictions, because the "court [wa]s not authorized to undertake an assessment of the plaintiff's obesity" in the absence of such an analysis by the ALJ. Id. at *3.

Here, the ALJ found Plaintiff's obesity a severe impairment (see Tr. 20), and provided an analysis of how he accounted for obesity in the RFC (see Tr. 25). Under such circumstances, the ALJ did not err by noting the absence of any proffered functional restrictions arising from Plaintiff's obesity (see Tr. 25). See Longworth v. Commissioner, Soc. Sec. Admin., 402 F.3d 591, 596 (6th Cir. 2005) ("[A] lack of physical restrictions constitutes substantial evidence for a finding of non-disability."); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (finding that lack of restrictions by treating physician supported ALJ determination that the plaintiff did not qualify as disabled); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (holding that ALJ "is entitled to rely not only on what the record says, but also on what it does not say"); Elrod v. Berryhill, No. 1:16CV1171, 2017 WL 3976626, at *10 (M.D.N.C. Sept. 7, 2017) (unpublished) (Webster, M.J.) (finding "ALJ's RFC determination [] supported by reports of physicians referencing [the p]laintiff's obesity, but none of them explaining or acknowledging any functional limitations as a result of [the p]laintiff's weight"), recommendation adopted, 2018 WL 1449517 (M.D.N.C. Mar. 23, 2018) (unpublished) (Tilley, S.J.); Stukes v.

19

Calvin, No. 8:14CV1305, 2015 WL 5231870, at *19 (D.S.C. Sept. 8, 2015) (magistrate judge's opinion adopted by district judge) (rejecting the plaintiff's argument that ALJ should not have considered lack of treating provider restrictions because the plaintiff "was nearing retirement[ and] her treating physicians would not have made findings related to RFC," and noting that the "p]laintiff b[ore] the burden of establishing her inability to work").

Next, Plaintiff contends that the ALJ "provide[d] no explanation for how he arrived at th[e five-minute] interval {every hour in the sit/stand option], which he appear[ed] to have plucked out of thin air." (Docket Entry 12 at 13 (citing Tr. 24); see also Docket Entry 15 at 2.) In support of that argument, Plaintiff takes issues with many of the ALJ's observations regarding the objective medical evidence, none of which carry the day. (See Docket Entry 12 at 13-15; see also Docket Entry 15 at 2-3.)

First, Plaintiff challenges the ALJ's observation "that sometimes [Plaintiff] had an antalgic gait and sometimes did not" (Docket Entry 12 at 13 (citing Tr. 24)), arguing that "the record reveals that more often than not, she did" (id. (citing Tr. 406, 412, 415, 433, 491, 518, 550, 641, 664, 703, 819 (antalgic gait); 403, 441, 573, 613, 872, 951 (non-antalgic gait))), and noting that "joint pain 'usually is activity related' and can wax and wane" (id. (citing https://www.healthcentral.com/condition/degenerative-joint-disease (last visited Feb. 25, 2021)); see also Docket Entry

20

15 at 2). As an initial matter, many of the transcript pages upon which Plaintiff relies reflect either findings prior to Plaintiff's alleged onset date (see Tr. 412/664 (10/2/15), 415/703 (7/17/15)), or constitute duplicate records of an earlier page citation (see Tr. 573 (duplicate of 441), 613 (duplicate of 403), 641 (duplicate of 406), 664 (duplicate of 412), 703 (duplicate of 415), 819 (duplicate of 550)). Thus, the record actually reflects <u>five</u> findings of antalgic gait (see Tr. 406, 433, 491, 518, 550) and <u>four</u> findings of non-antalgic gait (see Tr. 403, 441, 872, 951) during the relevant period. Accordingly, the ALJ did not err in stating that Plaintiff "<u>at times</u> displayed an antalgic gait[; y]et, on other occasions treatment providers noted her gait was normal." (Tr. 24 (emphasis added).)

Plaintiff next contends that "[t]he ALJ note[d] that[,] on one occasion[, Plaintiff] walked well without any assistive device, but fail[ed] to note that[,] at the same exam, she had right hip pain with flexion" (Docket Entry 12 at 13 (citing Tr. 24, 872) (footnote omitted)) "or that Dr. Bolz documented decreased hip flexion" (<u>id.</u> at 14 (citing Tr. 435)), which would "impact[] [Plaintiff's] ability to walk" (<u>id.</u>). Plaintiff's argument fails because it glosses over the ALJ's subsequent discussion of Plaintiff's hip impairment, in which he acknowledged Plaintiff's complaints of hip pain and expressly observed that "examinations of [Plaintiff]'s

hips at times noted <u>decreased range of motion</u>" (Tr. 24 (emphasis added) (citing Tr. 435 (<u>Dr. Bolz's</u> range of motion chart)).[10]

Plaintiff additionally contests "the ALJ['s] not[ation] that straight-leg-raising tests [('SLR')] were 'at times' positive" (Docket Entry 12 at 14 (citing Tr. 24)), pointing out that "every time they were assessed, they were positive" (<u>id.</u> (citing Tr. 403, 406, 412, 415, 421, 432, 491, 613, 641, 664, 703, 734, 766, 1032); <u>see also</u> Docket Entry 15 at 5). Although Plaintiff correctly observes that each SLR test in the record reflects a positive finding (<u>see</u> Docket Entry 12 at 14), she fails to acknowledge that examinations exist in the record that lack <u>any</u> SLR findings at all (<u>see, e.g.</u>, Tr. 441, 550, 518, 1032, 872, 951). Thus, the ALJ did not err in stating that SLR tests "were <u>at times</u> positive" (Tr. 24 (emphasis added)).

Plaintiff also faults the ALJ for relying on Plaintiff "'consistently' having 5/5 strength in her lower extremities" and the "lack of emergency treatment or hospitalization" to "justify the RFC," contending that such findings "say[] nothing about the pain that her degenerative diseases and obesity would cause when weight-bearing for 55 minutes at a time." (Docket Entry 12 at 14 (citing Tr. 24); <u>see also</u> Docket Entry 15 at 2-3.) The ALJ's observation that Plaintiff consistently retained full strength in her lower extremities (<u>see</u> Tr. 24) supports the ALJ's decision to

---

[10] The record contains two treatment notes reflecting the observation that Plaintiff "walk[ed] well without an assistive device." (Tr. 872, 951.)

22

limit Plaintiff to light as opposed to sedentary work, as well as his inclusion of only a once-per-hour sit/stand option (see Tr. 23). Furthermore, contrary to Plaintiff's assertions, the absence of emergency treatment for Plaintiff's back, leg, and hip pain reflects upon the severity of such pain. See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (deeming "absence of hospitalizations" . . . during relevant period properly considered in determining severity of symptoms); Maravel v. Saul, No. 1:20CV624, 2021 WL 1751936, at *14 (M.D.N.C. May 4, 2021) (unpublished) (holding that lack of recent psychiatric inpatient hospitalizations "bear[s] relevance to the ALJ's assessment of the continuing severity of [the p]laintiff's symptoms"), recommendation adopted, 2021 WL 3361924 (M.D.N.C. June 2, 2021) (unpublished) (Eagles, J.), appeal filed, No. 21-1835 (4th Cir. Aug. 2, 2021); McCullough v. Commissioner of Soc. Sec., No. 2:17CV56, 2018 WL 2269910, at *6 (E.D. Wash. May 17, 2018) (unpublished) (finding "reasonable" ALJ's reliance on medical expert's "testimony regarding [the p]laintiff's lack of emergency treatment for her migraines as powerful evidence regarding the extent to which she was in pain" (internal quotation marks omitted)); Jones v. Colvin, No. 5:12CV72, 2013 WL 5964565, at *5 (W.D. Va. Nov. 8, 2013) (unpublished) (determining that ALJ did not err in considering the plaintiff's "lack of hospitalization" in assessing the severity of her symptoms, and noting that "[a]n absence of severe flare-ups in

23

a claimant's condition is certainly relevant in determining its overall severity").

Next, Plaintiff objects to the ALJ's remark "that [Plaintiff wa]s [not] a candidate for lumbar spine surgery" (Docket Entry 12 at 14 (citing Tr. 24)), "without acknowledging that Dr. Bolz concluded that [Plaintiff's] prognosis was poor without surgical intervention" (id. (citing Tr. 434)). As an initial matter, the fact that none of Plaintiff's treating providers recommended surgical options for her back and hip impairments (see Tr. 430) holds relevance to the severity of those impairments, see David M. v. Commissioner of Soc. Sec., Civ. No. C20-1668, 2021 WL 4439480, at *2 (W.D. Wash. Sept. 28, 2021) (unpublished) (rejecting the plaintiff's "argu[ment] that the ALJ erred in emphasizing that [the plaintiff's] condition did not warrant surgery," noting that "[the p]laintiff ha[d] not shown that the ALJ . . . erred in considering th[at] type of evidence when evaluating [the plaintiff's] allegations" (citing 20 C.F.R. § 416.929(c)(3))), and thus the ALJ did not err in relying on that fact to support the RFC. Moreover, the ALJ accorded "little weight" to Dr. Bolz's opinions (Tr. 27) and, for the reasons detailed in connection with Plaintiff's second assignment of error, the ALJ did not err in so doing.

Additionally, Plaintiff criticizes the ALJ's notation "that [Plaintiff] reported her hip pain improved following injections in late 2018" (Docket Entry 12 at 14 (citing Tr. 24, 1143)), because the ALJ "fail[ed] to acknowledge that[,] at the same exam[,

24

Plaintiff's] overall pain was 5/10, or moderate" (id. at 15 (citing Tr. 1143, 1170)), "or that her pain still interfered with her walking ability, 7/10; general activity, 8/10; sleep, 9/10; and ability to concentrate, 8/10" (id. (citing Tr. 1171); see also Docket Entry 15 at 3).  As a threshold matter, the ALJ indicated that he considered the entire record, as well as evaluated all of Plaintiff's symptoms (see Tr. 23), and labored under no obligation to discuss every piece of evidence in the record, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)).  Furthermore, the ALJ clearly acknowledged Plaintiff's hip pain, as he found Plaintiff's bilateral hip degenerative joint disease a severe impairment (see Tr. 20), discussed the imaging results confirming that diagnosis (see Tr. 24), recognized that Plaintiff had experienced decreased hip range of motion (see id.), and limited Plaintiff to light exertion work with a sit/stand option to accommodate Plaintiff's hip symptoms (see id.; see also Tr. 23).

Furthermore, the record belies Plaintiff's contention that, "[w]hile the injections may have improved [Plaintiff]'s hip pain, there is no evidence that her back and bilateral lower limb pain secondary to the L3-4 radiculopathy improved long term." (Docket Entry 12 at 15 (emphasis added) (citing Tr. 403, 406, 412, 415, 421, 441, 487, 515, 550, 573, 613, 641, 664, 703, 734, 766, 819, 908, 987).)  Beginning in June 2018, Plaintiff reported significant improvement in her lower back pain following transforaminal

25

epidural steroid injections (see Tr. 950, 987), which improvement continued following a second set of injections in August 2018 (see Tr. 871, 908), resulting in her pain management provider remarking in September 2018 that the "goal should be to wean opioids as [Plaintiff's] back issues have improved" (Tr. 831 (emphasis added)). At a follow-up visit in November 2018, Plaintiff reported that her hip pain had improved significantly and that she had "no other pain issues," which led to her provider opining that he "d[id] not think chronic opioids [we]re indicated any further." (Tr. 1143 (emphasis added).)

Plaintiff further maintains that, although "the ALJ even acknowledged that [Plaintiff]'s weight m[ight] affect her ability to stand and walk for extended periods" (Docket Entry 12 at 10 (citing Tr. 21)), the ALJ did not "assess[] th[at] obesity-related limitation when finding that [Plaintiff] could perform light work, which requires 'a good deal of walking or standing'" (id. (quoting Social Security Ruling 83-10, Titles II and XVI: Determining Capability to Do Other Work – The Medical-Vocational Rules of Appendix 2, 1983 WL 31251 (1983) ("SSR 83-10")); see also Docket Entry 15 at 2). Notably, however, the ALJ's observation that Plaintiff's "weight may affect her ability to stand and walk for extended periods" (Tr. 21 (emphasis added)) does not constitute a finding that Plaintiff's obesity precluded her from standing and/or walking for extended periods. No inconsistency thus exists between that observation and the light-exertion RFC, particularly given

26

that the ALJ found Plaintiff's subjective report that she remained "unable to stand or walk for over 20 minutes" (Tr. 23; see also Tr. 42) "not entirely consistent" with the evidence of record (Tr. 24), a finding unchallenged by Plaintiff (see Docket Entries 12, 15).

In sum, Plaintiff's first issue on review fails as a matter of law.

## 2. Opinions of Dr. Bolz

Plaintiff next asserts that the ALJ erred in discounting the opinions of Dr. Bolz, in that "the ALJ only pointed to the alleged vagueness of [Dr. Bolz's] conclusions," and "fail[ed] to comply with the Commissioner's regulations" regarding the evaluation of opinion evidence. (Docket Entry 12 at 16 (bold font and single-spacing omitted); see also Docket Entry 15 at 7-8.) In particular, Plaintiff deems the ALJ's criticism that Dr. Bolz failed to "'explain the degree of limitation' he imposed" (Docket Entry 12 at 17 (quoting Tr. 27)) "contrary to the Commissioner's regulations, which require the ALJ to weigh medical-source opinions based upon their support, consistency, and the examining relationship, and not on whether they provide specific limitations" (id. (citing 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6))). Moreover, although Plaintiff acknowledges that the term used by Dr. Bolz, "moderately severely impaired," does not qualify as a "specific limitation," (id. (quoting Tr. 434)), she argues that "neither are the terms that the [SSA] consultants and the ALJ routinely use —

27

'moderate,' 'mild,' or 'marked' — to describe degrees of mental limitations" (id.), noting that "[t]he ALJ had no trouble translating th[e] moderate findings [in the paragraph B criteria at step three] into specific limitations" (id. at 18 (citing Tr. 21-23; see also Docket Entry 15 at 8). Plaintiff's arguments do not establish entitlement to reversal or remand.

Consultative examiners like Dr. Bolz do not constitute treating sources under the regulations, see 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), and thus their opinions, as a general proposition, do not warrant controlling weight, Turberville v. Colvin, No. 1:11CV262, 2014 WL 1671582, at *6 (M.D.N.C. Apr. 23, 2014) (unpublished), recommendation adopted, slip op. (M.D.N.C. May 15, 2014) (Eagles, J.). However, the ALJ must nevertheless evaluate consultative opinions using the factors outlined in the regulations, and expressly indicate and explain the weight he or she affords to such opinions. See 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Regardless of its source, [the ALJ] will evaluate every medical opinion [he or she] receive[s]" and, where an opinion does not warrant controlling weight, the ALJ must "consider all of the . . . factors [in 20 C.F.R. § 416.927(c)(1)-(6)] in deciding the weight [to] give to any medical opinion." (emphasis added)); Social Security Ruling 96-5p, Medical Source Opinions on Issues Reserved to the Commissioner, 1996 WL 374183, at *5 (July 2, 1996) ("SSR 96-5p") (noting that ALJs "must weigh medical source

28

statements . . . [and] provid[e] appropriate explanations for accepting or rejecting such opinions" (emphasis added)).

On March 27, 2017, Dr. Bolz conducted a consultative medical examination of Plaintiff (Tr. 430-35), reporting Plaintiff's diagnoses as "[s]ignificant lumber spine disease, particularly at L5 on the right," "[l]eft sacroiliitis," "[h]istory of radicular pain in the right leg and foot," "[b]ilateral arthritis of the hips," "[m]ild asthma," "[u]ncontrolled hypertension," and "[l]eft carpal tunnel syndrome" (Tr. 433). On examination, Dr. Bolz noted that Plaintiff "appear[ed] comfortable sitting" (Tr. 432), did not use an assistive device (see id.), displayed 5/5 strength in all tested muscles (see Tr. 433), had good pedal pulses (id.), showed intact sensation and coordination (id.), and lacked lumbar spasm (see Tr. 432) or edema (see Tr. 433). On the other hand, Dr. Bolz detected "exquisite tenderness" in Plaintiff's paraspinal muscles at L5 on the right and in her left sacroiliac joint (Tr. 432), recorded positive SLR tests at 50 degrees on the right and 45 degrees on the left (see id.), observed pain with hip range of motion and an antalgic gait on both legs (see Tr. 433), remarked that Plaintiff could only squat "half-way" with support and could "barely" heel and toe walk (id.), and documented decreased range of motion in Plaintiff's thoracolumbar spine, hips, and knees (see Tr. 435). Ultimately, Dr. Bolz rated Plaintiff's prognosis as "[p]oor, without surgical intervention" and concluded that her "ability to perform work-related activities such as bending, stooping, lifting,

29

walking, crawling, squatting, carrying, traveling, pushing and
pulling heavy objects, as well as the ability to hear and speak,
appear[ed] to be moderately severely impaired due to the sum of the
findings [in his report]." (Tr. 434 (emphasis added).)

The ALJ evaluated and weighed Dr. Bolz's opinions as follows:

> The [ALJ] gives little weight to the opinion [of Dr.
> Bolz]. Dr. Bolz opined [Plaintiff]'s ability to perform
> work-related activities such as bending, stooping,
> lifting, walking, crawling, squatting, carrying,
> traveling, pushing and pulling heavy objects, hearing,
> and speaking are moderately severely impaired. Similar
> to [consultative psychological examiner] Dr. [Gregory A.]
> Villarosa's opinion, Dr. Bolz does not explain the degree
> of limitation in the above functional activities.
> Accordingly, his opinion provides little insight into
> [Plaintiff]'s longitudinal abilities and the undersigned
> gives it little weight.

(Tr. 27 (emphasis added) (internal citation omitted).)

The ALJ did not err by discounting Dr. Bolz's opinion as
lacking an explanation of "the degree of limitation" and as
"provid[ing] little insight into [Plaintiff's] abilities" (id.).
As an initial matter, Dr. Bolz lumped all of the exertional,
postural, and communicative "work-related activities" together as
equally impaired (Tr. 434); yet, he did not explain the basis for
the impairment of Plaintiff's ability to hear and speak (see id.),
and his examination reflected normal hearing (see Tr. 432) and no
findings regarding speech (see Tr. 431-33). Moreover, Dr. Bolz
equivocated by opining that all of Plaintiff's listed abilities
"appear[ed] to be moderately severely impaired" (Tr. 434 (emphasis
added)), which falls short of affirmatively stating the degree of

Plaintiff's limitations. Additionally, the ALJ correctly observed that Dr. Bolz provided no explanation as to how a "moderately severe[] impair[ment]" translates into actual functional restrictions (Tr. 434). See Lamb v. Saul, No. 2:19CV26, 2020 WL 6391097, at *4 (E.D.N.C. July 6, 2020) (unpublished) (finding no error in ALJ's decision to accord consultative psychological examiner's opinion little weight, in part, because "it is vague as to specific functional limitations or their degree"), recommendation adopted, 2020 WL 4784699 (E.D.N.C. Aug. 18, 2020) (unpublished); Hadley v. Berryhill, No. 3:18CV1190, 2019 WL 1063401, at *14 (S.D.W. Va. Feb. 13, 2019) (unpublished) (affirming ALJ's discounting of consultative medical examiner's opinion that the plaintiff's "ability in performing bending, stooping, lifting, walking, crawling, squatting, carrying, traveling, and pushing and pulling heavy objects was 'moderately impaired,'" noting that "ALJ [wa]s correct that the opinion provides nothing more with respect to what [the plaintiff] can still do despite [her] impairments" and that, "[i]n addition to her burden of showing she has a medically determinable impairment, [the plaintiff] must demonstrate 'a showing of related functional loss'" (citing Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986))), recommendation adopted, 2019 WL 1061676 (S.D.W. Va. Mar. 6, 2019) (unpublished).

Plaintiff's attempt to analogize the mental listing rating of "moderate" to Dr. Bolz's finding of "moderately severely impaired" misses the mark. (See Docket Entry 12 at 17-18; see also Docket

Entry 15 at 8).) The paragraph B criteria of the mental listings uses a 5-point scale to rate the degree of limitation in areas of mental functioning – none, mild, moderate, marked, and extreme. See 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). As relevant here, the regulations define a "moderate" limitation as "fair" ability to function "independently, appropriately, effectively, and on a sustained basis," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c., and define a "marked" limitation as "seriously limited" ability to function "independently, appropriately, effectively, and on a sustained basis," id., § 12.00F.2.d. In contrast, Dr. Bolz did not provide any guidance as to the degree of limitation he intended by finding Plaintiff's abilities "moderately severely impaired," and his use of compound adverbs further muddied the waters. (Tr. 434.)

Plaintiff contends that the ALJ did not make any findings as to the supportability or consistency with the record of Dr. Bolz's opinion, as required by the applicable regulations. (See Docket Entry 12 at 17 (citing 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6)); see also Docket Entry 15 at 7-8.) Plaintiff's argument glosses over the fact that the ALJ expressly found that "Dr. Bolz d[id] not explain the degree of limitation in the [] functional activities" (Tr. 27), i.e., the ALJ found that Dr. Bolz did not support his opinion with a proper explanation.

Although the ALJ did not expressly discuss the consistency of Dr. Bolz's opinion with the record (see id.), any error by the ALJ

32

in that regard remains harmless under the circumstances presented here, see generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Plaintiff simply has not shown that remand for an express discussion of the consistency of Dr. Bolz's opinion with the remainder of the record would lead to a favorable outcome in his case. To the extent Plaintiff believes that Dr. Bolz's "moderately severely impaired" opinion compels a sedentary (or less-than-sedentary) RFC, the ALJ discussed substantial evidence which conflicted with that opinion (see Tr. 20-27), including crediting the state agency medical consultants' opinions that Plaintiff remained able to perform light work (see Tr. 25-26, 179-80, 197-98, 217, 237), but not crediting their opinions limiting Plaintiff to occasional postural movements (see Tr. 25-26, 180, 198, 218, 238), because Plaintiff "had mostly full range of motion throughout her extremities" (Tr. 26 (citing Tr. 435 (Dr. Bolz's range of motion chart))), and Plaintiff's "activities such as gardening and fishing [we]re inconsistent with th[o]se limitations" (id.).

Accordingly, the ALJ did not commit prejudicial error with respect to his analysis of Dr. Bolz's opinions, and Plaintiff's allegations of error thus fail as a matter of law.

### 3. Appointments Clause

In Plaintiff's third and final assignment of error, she alleges that she "is entitled to a new hearing on her 2013 applications because the ALJ was not a Constitutionally-appointed officer at the time he denied [Plaintiff]'s prior applications." (Docket Entry 12 at 19 (bold font and single-spacing omitted); see also Docket Entry 15 at 8-10.) In particular, Plaintiff contends that the United States Supreme Court has "held that ALJs of the Securities and Exchange Commission are inferior officers subject to the Appointments Clause of the U.S. Constitution" and thus that "the President, courts of law, or heads of departments must appoint them." (Docket Entry 12 at 19 (citing Lucia v. SEC, 585 U.S. ___, ___, 138 S. Ct. 2044, 2053-54 (2018)).) Although Plaintiff acknowledges that, "[o]n July 16, 2018[,] all SSA ALJs were Constitutionally-appointed," she asserts that "ALJ hearings held before that date were not Constitutionally-authorized proceedings and so could not lead to Constitutionally-authorized decisions." (Id. at 20.) Thus, Plaintiff argues, "[t]he ALJ's January 27, 2016[,] decision denying [Plaintiff]'s 2013 applications for [DIB] and [SSI] is therefore void because the ALJ's appointment to his office violated the Constitution's Appointments Clause." (Id.) Plaintiff further points out that "claimants do not forfeit their Appointments Clause challenges by failing to raise them during their administrative proceedings" (id. (citing Probst v. Saul, 980

34

F.3d 1015, 1025 (4th Cir. 2020), <u>cert. denied</u>, ___ U.S. ___, 141 S. Ct. 2633 (2021)), and maintains that "an appropriate remedy for the violation is a new hearing on [Plaintiff]'s earlier applications, conducted by a properly-appointed new ALJ" (<u>id.</u> (citing <u>Lucia</u>, 585 U.S. at ___, 138 S. Ct. at 2055)).  Those arguments fail as a matter of law for two reasons.

First, as noted above in connection with the procedural history of Plaintiff's claims, after the Appeals Council denied Plaintiff's request for review of the 2013 unfavorable ALJ decision (<u>see</u> Tr. 171; <u>see also</u> Tr. 148-64), Plaintiff sought judicial review in this Court, resulting in affirmance of the Commissioner's final decision denying benefits, <u>see</u> <u>Webb v. Berryhill</u>, No. 1:17CV341, 2018 WL 2198829 (M.D.N.C. May 14, 2018) (unpublished), <u>recommendation adopted</u>, 2018 WL 2583113 (M.D.N.C. June 4, 2018) (unpublished) (Biggs, J.).[11]  Although the United States Supreme Court decided <u>Lucia</u> on June 21, 2018, i.e., during the time Plaintiff could have appealed this Court's unfavorable decision to the Fourth Circuit, <u>see</u> Fed. R. App. Proc. 4(a)(1)(B)(ii) (providing 60 days to appeal), Plaintiff did not appeal, <u>see</u> <u>Webb</u>, No. 1:17CV341 (M.D.N.C.) (Docket Entries dated June 4, 2018, to the present).  Having fully exhausted her appeal rights with respect to

---

[11] Both parties appear to mistakenly believe that Plaintiff did not seek judicial review of the Commissioner's final decision denying her 2013 applications.  (<u>See</u> Docket Entry 14 at 19 ("Plaintiff did not appeal the January 27, 2016 [ALJ] decision); Docket Entry 15 at 10 ("When the Appeals Council denied review of [Plaintiff]'s 2013 claim[s], adversarial development of the Appointments Clause issue simply did not exist (and could not exist) in her ALJ proceedings." (internal quotation marks and certain brackets omitted)).)

her 2013 applications for benefits, <u>Lucia</u> does not afford Plaintiff a second bite at the apple, as made clear by this excerpt from <u>Probst</u>:

> Had this case come before us in July 2018, when the number of potential <u>Lucia</u> claimants was at its peak, the volume of probable remands might have weighed more heavily on our analysis. But now that the Commissioner has ratified the appointments of all ALJs as her own, there are no new Appointments Clause challenges brewing in SSA cases. And <u>because Social Security claimants have only a sixty-day window to appeal an Appeals Council decision to a district court, all claimants whose benefits were denied before the Commissioner's July 2018 ratification of the SSA's ALJs have long since either filed an appeal in district court or become time-barred from doing so</u>. In other words, even if the Commissioner is correct that there are many hundreds of [these] cases in federal district courts, those cases represent <u>all</u> such claims, not the tip of the iceberg.

<u>Probst</u>, 980 F.3d at 1024–25 (emphasis added) (internal quotation marks and citations omitted); <u>see also</u> <u>Cirko v. Commissioner</u>, 948 F.3d 148, 159 (3d Cir. 2020) ("[C]laimants must appeal the Appeals Council's decision to the [d]istrict [c]ourt within sixty days, and *Lucia* was decided more than a year ago. <u>That means every claimant whose benefits were denied prior to *Lucia* has long since either filed an appeal in district court or become time-barred from doing so</u>." (emphasis added) (internal citations omitted)).

Second, Plaintiff proffers no evidence that she petitioned the SSA to reopen her prior application for benefits. (<u>See</u> Docket Entries 12, 15.) The regulations provide that the SSA can reopen a final and binding determination "on [its] own initiative," or a claimant "may ask that a final determination . . . be reopened."

36

20 C.F.R. §§ 404.987, 416.1487. A final determination "may be reopened" within 12 months of the date of decision "for any reason," 20 C.F.R. §§ 404.988(a), 416.1488(a), within two years (for SSI) and/or within four years (for DIB) of the date of decision "if [the SSA] finds good cause," 20 C.F.R. §§ 404.988(b), 416.1488(b), and "at any time" in cases of certain circumstances not implicated by Plaintiff's instant contentions, see 20 C.F.R. §§ 404.988(c), 416.1488(c). Plaintiff presents no evidence that she availed herself of any of those options for requesting reopening of her 2013 applications. (See Docket Entries 12, 15.) In the absence of a denial by the SSA of a request to reopen Plaintiff's 2013 applications on the basis of Lucia, this Court lacks subject matter jurisdiction under 42 U.S.C. § 405(g) to consider those applications, see Califano v. Sanders, 430 U.S. 99, 107-08 (1977) (holding that Section 405(g) permits judicial review of already finalized application for benefits only where the SSA's "denial of a petition to reopen is challenged on constitutional grounds" (emphasis added)); see also Huff v. Barnhart, 126 F. App'x 85, 86 (4th Cir. 2005) ("[F]ederal courts are without jurisdiction to review the Commissioner's refusal to reopen claims for disability benefits unless the claimant challenges the refusal on constitutional grounds." (emphasis added) (citing Sanders, 430 U.S. at 107-08)); Hall v. Chater, 52 F.3d 518, 520 (4th Cir. 1995) ("[N]either the Administrative Procedure Act nor 42 U.S.C. § 405(g) confers subject matter jurisdiction on federal courts to review the

37

[SSA]'s <u>refusal to reopen</u> a prior determination." (emphasis added)
(citing <u>Sanders</u>, 430 U.S. at 102)); 20 C.F.R. §§ 404.903 (a)(5),
416.1403(a)(5) (barring judicial review of "[d]enial of a request
to reopen a determination or a decision").

Under these circumstances, Plaintiff's third issue on review
falls short.[12]

---

[12] Plaintiff's Suggestion of Subsequently Decided Authority points the Court to
the United States Supreme Court's decision in <u>Collins v. Yellen</u>, ___ U.S. ___,
141 S. Ct. 1761 (2021) (see Docket Entry 16 at 1), which deemed unconstitutional
a provision requiring cause for removal of the Director of the Federal Housing
Finance Agency, <u>see Collins</u>, ___ U.S. at ___, 141 S. Ct. at 1783-84, as well as
a Memorandum Opinion from the Office of Legal Counsel to Deputy Counsel to the
President interpreting <u>Collins</u> to render unconstitutional the statute limiting
the President's authority to remove the Commissioner of SSA to grounds of neglect
of duty and malfeasance in office (see Docket Entry 16-1; <u>see also</u> 42 U.S.C.
§ 902(a)(3)). To the extent the Court has any obligation to address a Suggestion
of Subsequently Decided Authority that does not relate to any issues raised in
a party's briefing, <u>Collins</u> does not provide any basis for granting relief to
Plaintiff, as a well-reasoned case by a neighboring district court explained:

> [I]n <u>Collins</u>[], the Supreme Court held that where an
> unconstitutional statutory removal restriction exists, a plaintiff
> seeking relief on that basis must show that the restriction caused
> the harm. In <u>Collins</u>, the [Supreme] Court reasoned that the
> relevant agency officials were "properly appointed" pursuant to a
> statute that exhibited "no constitutional defect in the . . . method
> of appointment" and that "the unlawfulness of [a] removal provision"
> does not strip [an official] of the power to undertake the other
> responsibilities of his office[.]" The [Supreme] Court continued
> that "there is no reason to regard any of the actions taken" by the
> agency during this period "as void." <u>Id.</u> at 1787, 1788 n. 23. In
> this case, [the p]laintiff, as in <u>Collins</u>, grounds his
> constitutional challenge only on the relevant removal restriction
> not on the propriety of the Commissioner's appointment and offers no
> evidence to show that there is a nexus between the unconstitutional
> removal restriction and the denial of his application for disability
> benefits. The [p]laintiff simply argues that all actions taken by
> the Commissioner are void due to the unconstitutional removal
> provision. However, <u>Collins</u> expressly rejects this view. <u>Id.</u>
> Therefore, the final decision of the ALJ is not constitutionally
> defective.

<u>Robinson v. Kijakazi</u>, No. 1:20CV358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27,
2021) (unpublished); <u>see also Boger v. Kijakazi</u>, No. 1:20CV331, 2021 WL 5023141,
at *3 (W.D.N.C. Oct. 28, 2021) (unpublished) ("Indeed, [the p]laintiff's
constitutional 'removal restriction' argument is likely not even applicable to
this case because [the] ALJ [in question] was appointed by an Acting Commissioner
(continued...)

38

### III.  CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for a Judgment Reversing or Modifying the Decision of the Commissioner of Social Security, or Remanding the Cause for a Rehearing (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.


                              ____/s/ L. Patrick Auld____
                                   **L. Patrick Auld**
                            **United States Magistrate Judge**


November 9, 2021

---

[12] (...continued)
of Social Security who could be removed from that office at the President's discretion.  See 42 U.S.C. § 902(b)(4); Collins, [___ U.S. at ___,] 141 S. Ct. at 1783 ('[W]e generally presume that the President holds the power to remove at will executive officers and that a statute must contain plain language to take [that power] away.'); see also United States v. Eaton, 169 U.S. 331, 343 (1898) (holding that[,] where a 'subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official')." (stray quotation mark omitted)).

39